IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CORRIE TARVER and HAZEL PORTER,   §
as Next Friends of FREDDIE        §
EUGENE TARVER, Deceased,          §
                                  §
                    Plaintiffs,   §
                                  § Civil Action No. 3:07-CV-0058-D
VS.                               §
                                  §
UNITED STATES OF AMERICA,         §
                                  §
                    Defendant.    §

<u>MEMORANDUM OPINION</u>

Plaintiffs Corrie Tarver and Hazel Porter, as next friends of Freddie Eugene Tarver ("Tarver"), sue defendant United States of America ("United States") under the Federal Tort Claims Act ("FTCA"), alleging that the negligence of two Dallas Veterans Affairs Medical Center ("VA") psychiatrists, Erika M. Navarro, M.D. ("Dr. Navarro") and Arif Khan, M.D. ("Dr. Khan"), proximately caused Tarver's death from a prescription drug overdose. Following a bench trial, and for the reasons that follow,[1] the court finds

_____

[1]The court sets out in this memorandum opinion its findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(1). Although the court has carefully considered the trial testimony and exhibits, this memorandum opinion has been written to comply with the level of detail required in this circuit for findings of fact and conclusions of law. *See, e.g., Century Marine Inc. v. United States*, 153 F.3d 225, 231 (5th Cir. 1998) (discussing standards). The court has not set out its findings and conclusions in punctilious detail, slavishly traced the claims issue by issue and witness by witness, or indulged in exegetics, parsing or declaiming every fact and each nuance and hypothesis. It has instead written a memorandum opinion that contains findings and conclusions that provide a clear understanding of the basis for the court's decision. *See id.*

and concludes that plaintiffs proved that Drs. Navarro and Khan were negligent in one respect, but they failed to prove that their negligence was a proximate cause of Tarver's death. Plaintiffs otherwise failed to prove that Drs. Navarro and Khan were negligent or that the VA as a healthcare provider was negligent. The court therefore enters judgment in favor of the United States.

I

Tarver was a veteran under the care of the VA[2] for treatment of schizoaffective disorder, bipolar type, having first been diagnosed with this serious mental illness in 1979. Dr. Navarro became his treating psychiatrist in 2001. On September 14, 2004 Tarver was voluntarily admitted to the VA after the police brought him to the urgent care department. Tarver had been found wandering the streets, hallucinating, labile, and distressed. Beginning on September 15, 2004 and concluding with Tarver's discharge on September 28, 2004, Dr. Khan was Tarver's primary inpatient treating psychiatrist and was the physician primarily in charge of Tarver's care. Tarver was discharged in part because he insisted on being discharged.

At about the midpoint of Tarver's hospitalization, Dr. Khan

---

[2]The VA is part of the Department of Veterans Affairs North Texas Health Care System ("VANTHCS"), and Drs. Navarro and Khan were employees of the VANTHCS during the relevant time period.

prescribed sertraline,[3] which was a new medication for Tarver, to address depression and chronic anxiety.   The original prescribed dosage was 50 milligrams each morning, increased by Dr. Khan (partly on Dr. Navarro's advice) to 100 milligrams close to Tarver's discharge.   Tarver had already been taking valproic acid before his admission to the VA, and the dosage was increased from 1,000 to 1,500 milligrams daily.[4]

Dr. Khan does not recall specifically what he told members of Tarver's family about the side effects of the drugs Tarver was taking.   Unless a patient is unable to consent or requests that the family be informed, the family is not usually contacted.   Nor does Dr. Khan recall whether he discussed the possibility of toxic interaction with any member of Tarver's family.   And because he did not talk to Tarver's family members, he is not sure whether they were ever warned about the potential toxic side effects of Tarver's medications.

The VA had on several occasions offered Tarver the option of residing in a group home, but he refused.   VA personnel did so again in connection with his hospital discharge.   Although Tarver agreed to the VA's request that he stay one additional day in the

_____

[3]The brand name for sertraline (Zoloft) was used at trial. For clarity, the court will refer to sertraline throughout this memorandum opinion.

[4]Valproic acid was also referred to at trial by its brand name Depakote.   For clarity, the court will refer to valproic acid throughout this memorandum opinion.

hospital, he again declined to reside in a group home.  In a group home, there are staff to help patients take prescription medications.

The VA has a Community Support Treatment Program ("CSTP"), a national intensive voluntary outpatient case management program for eligible psychiatric patients.  The VA's north Texas program was established in 1995, and it targets patients with chronic and severe mental illness.[5]  The CSTP is designed for high users of VA psychiatric services, i.e., veterans who are in and out of the hospital and are unable to remain in the community.  It is designed to decrease psychiatric hospitalization by keeping patients in the community.  Case managers work with between 10 and 15 patients, visiting their homes or other places of residence.  They check on the patients two to three times per week to ensure that they are taking their medications as prescribed and are aware of appointments with the psychiatrist, to see that their basic needs (such as food) are being met, to address any social needs, and to make sure the patients are in generally good condition and are not relapsing into a psychiatric episode that might require hospitalization.  A physician provides psychiatric care, primarily through office visits. Case managers also assist patients in getting to appointments. Tarver had previously qualified for and

---

[5]At the time of Tarver's discharge, Dr. Navarro was a part-time psychiatrist for the CSTP and a part-time psychiatrist for the VA outpatient clinic.

participated in the CSTP from 1997 to 2002. Before he was discharged from the hospital on September 28, 2004, he was screened for participation in the CSTP. He failed to qualify, however, because he did not meet the requirement of "three or more admissions in the past 12 months or 30 cumulative days of inpatient psychiatric care in the past 12 months." GX 1 at 608.

After Tarver's discharge, primary responsibility for his psychiatric care returned to Dr. Navarro. Tarver missed his two scheduled October appointments with Dr. Navarro, although he kept his appointment scheduled for November 18, 2004. Tarver's brother accompanied him to that appointment and informed Dr. Navarro of changes he had noticed in Tarver's thinking during the prior month. She was concerned that Tarver had run out of his medications at least two to three weeks before the appointment. The prescriptions were for 30 days, and he had not renewed them. Based on what Tarver's brother had related, Dr. Navarro assumed that Tarver's psychotic symptoms were recurring. But because Tarver did not appear to be dangerous to himself or others or in need of hospitalization, Dr. Navarro decided to restart his medications, which had worked during his prior hospitalization, and see how he responded. She renewed his prescriptions, continued Tarver on sertraline and the other medications (including the same dosages of sertraline and valproic acid), and scheduled him for a follow-up visit in two weeks.

Dr. Navarro does not recall whether she warned Tarver, his brother, or any other family member of potential side effects of sertraline or of his multi-drug medication treatment.  And she did not consider on November 18 that Tarver should be reevaluated for the CSTP.

Tarver did not return in two weeks for his appointment.  He was found dead in his car on December 5, 2004.  The medical examiner concluded that he had died of a prescription drug overdose——a combination of drugs and their toxic effects and side effects——and that hypertensive cardiovascular disease contributed to his death.  She also opined that Tarver died of an acute overdose rather than a chronic overdose, taken in a large amount at approximately the same time.  According to the medical examiner, it may not have been an acute overdose taken just hours before Tarver died, but it may have been an overdose taken the day or so before.

## II

Under the FTCA, the United States is liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances[.]"  28 U.S.C. § 2674.[6]  "[T]he extent of the United States' liability under the FTCA is generally determined by reference to state law."  *Molzof v. United States*, 502 U.S. 301, 305 (1992) (collecting cases).  "Under the FTCA, liability for

---

[6]The United States is not liable under the FTCA, however, "for interest prior to judgment or for punitive damages."  28 U.S.C. § 2674.

medical malpractice is controlled by state law, the law of Texas in this case." *Hollis v. v. United States*, 323 F.3d 330, 334 (5th Cir. 2003) (citing *Ayers v. United States*, 750 F.2d 449, 452 n.1 (5th Cir. 1985), and *Urbach v. United States*, 869 F.2d 829, 831 (5th Cir. 1989)).

Under Texas law,

> [t]o recover on a medical malpractice claim, a plaintiff must establish the following elements: (1) a legally cognizable duty requiring the physician to conform to a certain standard of care or conduct, (2) the applicable standard of care, (3) a breach of that standard, (4) injury, and (5) a reasonably close causal connection between the breach and the injury the plaintiff suffered.

*Wax v. Johnson*, 42 S.W.3d 168, 171 (Tex. App. 2001, pet. denied).

"[T]he question of duty is a question of law which must be decided before the issue of standard of care arises." *St. John v. Pope*, 901 S.W.2d 420, 424 (Tex. 1995). It is undisputed in this case that Drs. Navarro and Kahn had a legally cognizable duty to Tarver requiring that they conform to the standard of care for a physician. To establish that Dr. Navarro or Dr. Kahn breached the applicable standard of care, plaintiffs must prove by a preponderance of the evidence that Dr. Navarro or Dr. Kahn was negligent in the treatment of Tarver and that such negligence caused Tarver's death. *See, e.g., Bradford v. Alexander*, 886 S.W.2d 394, 396 (Tex. App. 1994, no writ) ("Thus, in order to prevail at trial, appellant would have to establish that Dr.

- 7 -

Alexander was negligent in his treatment and that his negligent acts caused her injury."). "In a medical malpractice case, breach of the standard of care and proximate cause must be established through expert testimony." *Ocomen v. Rubio*, 24 S.W.3d 461, 466 (Tex. App. 2000, no pet.) (citing *Onwuteaka v. Gill*, 908 S.W.2d 276, 281 (Tex. App. 1995, no writ)).

Under Texas law, "negligence," when used with respect to the conduct of Dr. Navarro and Dr. Khan, means failure to use ordinary care, that is, failing to do that which a psychiatrist of ordinary prudence would have done under the same or similar circumstances or doing that which a psychiatrist of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of Dr. Navarro and Dr. Khan, means that degree of care that a psychiatrist of ordinary prudence would use under the same or similar circumstances."

"Proximate cause," when used with respect to the conduct of Dr. Navarro and Dr. Khan, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a psychiatrist using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.

There may be more than one proximate cause of an event.[7]

### III

The court considers first whether plaintiffs have proved by a preponderance of the evidence that Drs. Navarro and Khan breached the standard of care, i.e., were negligent.

### A

Plaintiffs offered expert testimony on the standard of care from Jerald H. Ratner, M.D. ("Dr. Ratner").[8] In his expert report, Dr. Ratner opined, based on ten grounds, that "the Veterans Administration[,] including their staff, failed to practice the standard of care[.]" PX 19 at 6. During his deposition—which is the same as his trial testimony[9]—Dr. Ratner withdrew grounds nos. 3, 8, and 10.[10] The seven that remain essentially collapse into

---

[7]Even assuming that, following the Texas Supreme Court's decision in *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007) (addressing "producing cause"), proximate cause should be defined to include a "substantial factor" element, the result of this decision would be the same.

[8]To the extent that plaintiffs rely on Gary H. Wimbish, Ph.D., their forensic toxicologist, to establish the standard of care, the court holds that he was not qualified to offer opinion testimony as a medical expert on the standard of care and that his pertinent opinions were refuted by Dr. Ratner, plaintiffs' medical expert.

[9]After plaintiffs designated Dr. Ratner as their medical expert, defendant took his deposition. Just before trial, plaintiffs obtained leave of court to call Dr. Ratner as a witness based solely on his deposition testimony. Consequently, his trial testimony consisted of answers to questions posed to him by defense counsel during the deposition.

[10]Dr. Ratner also qualified other grounds that he did not withdraw entirely. E.g., ground nos. 4 and 5.

these two grounds for opining that the VA and its staff breached the standard of care: first, they should have engaged in more intensive monitoring and supervision of Tarver during the period of September 14, 2004 through December 5, 2004 by placing him in the CSTP or possibly involuntary inpatient treatment, with "a prefer[ence] to have had him discharged with CSTP monitoring," Ratner Dep. 41; and, second, they should have informed and educated Tarver's family between September 14, 2004 and November 18, 2004[11] "concerning monitoring and supervision of medications[,] such as dosages, side effects, and warning signs of toxicity." PX 19 at 7.

That Dr. Ratner's opinions essentially fold into these two overarching conclusions is confirmed by his testimony as a whole. For example, ground no. 4 related to failure to heed warnings from Tarver's family that he was unable to care for himself. But through questioning at the deposition, it was clarified that Dr. Ratner was only complaining that the VA should have created a documented plan of supervision involving the CSTP. And Dr. Ratner stated that, outside the CSTP and inpatient care, there was nothing more they could have done. Ground no. 5 referred to a failure to appropriately supervise Tarver, but Dr. Ratner clarified that this complaint also related to the need for supervision such as provided

---

[11]Dr. Ratner testified that the failure to inform and educate Tarver's family took place between September 14 and November 18, 2004. *See* Ratner Dep. 55 ("Failure to take place was 9/14 to 11/18.").

- 10 -

by the CSTP team.   In his testimony regarding ground no. 6, Dr.
Ratner based his complaint about the VA's failure to act on
November 18, 2004 specifically on the failure to attempt to put
Tarver in the CSTP.   In response to a question about ground no. 9,
Dr. Ratner clarified that his opinion rested on the assertion that
the VA was negligent by not having the CSTP monitor Tarver on an
outpatient basis.

B

The court finds that plaintiffs did not prove by a
preponderance of the evidence that Drs. Navarro and Khan were
negligent in failing to continue Tarver in involuntary inpatient
care rather than discharge him.[12]   Dr. Ratner viewed the option of
involuntary inpatient care as a possibility, but his preference was
not to keep Tarver in the hospital but instead to discharge him
with CSTP monitoring.   The court declines to find negligence where
even plaintiffs' expert "preferred" a course other than continued
hospitalization.

Moreover, while Dr. Ratner opined that he would have kept
Tarver in the hospital as long as he could have, and would have
postponed his discharge at least long enough to get an evaluation
for the CSTP, he acknowledged that if Tarver did not qualify for

---

[12]Additionally, the evidence shows that Dr. Khan, not Dr.
Navarro, was the physician who made the decision to discharge
Tarver.   This provides an additional ground for holding that Dr.
Navarro was not negligent on this basis.

the CSTP, he would have discharged him against medical advice. Plaintiffs failed to prove that Drs. Navarro and Khan were negligent for failing to discharge Tarver against medical advice. Dr. Ratner essentially conceded that doing so would not necessarily have been part of the standard of care. And even if such a failure constituted negligence, plaintiffs have failed to prove that discharging Tarver against medical advice could have prevented his death from a drug overdose. They have thus failed to prove causation even if they have shown negligence.

Finally, Dr. Ratner acknowledged that, if Tarver did not want to remain in the hospital—and the evidence is undisputed that he did not—he could not, due to his rights as a patient, be hospitalized involuntarily unless the grounds for involuntary commitment could be established. Although Dr. Ratner believed that Tarver met these criteria on September 28, 2004, plaintiffs failed to prove that Tarver could have been involuntarily hospitalized for a sufficient length of time that he would not have died from a drug overdose several months later, on December 5, 2004. In other words, even if the court credits Dr. Ratner's opinion and assumes that Tarver should not have been discharged on September 28, 2004, or could have been kept involuntarily, plaintiffs have failed to prove that Tarver would have remained hospitalized for a sufficient period that he would not have been able in early December to take

an overdose of prescription drugs.[13]

C

The court finds that plaintiffs did not prove by a preponderance of the evidence that Drs. Navarro and Khan were negligent in failing to engage in more intensive monitoring and supervision by placing Tarver in the CSTP.  Drs. Navarro and Khan did not have the authority to admit Tarver into the CSTP.  The program had prescribed eligibility criteria.  The evidence shows that Tarver was not eligible for the CSTP because he had not had three or more hospital admissions in the past twelve months or thirty cumulative days of inpatient psychiatric care in the past twelve months.  Moreover, VA data for 2004 shows that, on average, 89% of the patients in the program had 80 days of psychiatric

_____

[13]Dr. Ratner referred at one point to a need to readmit Tarver to the hospital when, during a November 18, 2004 appointment with Dr. Navarro, it was clear that he was noncompliant with his medications.  This testimony did not relate to the decision to discharge him on September 28, 2004.  And Dr. Ratner's testimony referred to several possibilities——readmitting Tarver, calling or sending a letter to the VA, or getting the VA involved in closer monitoring through the CSTP——and he ultimately stated that he would have pursued with the VA some way of getting a CSTP team assigned right then.  This evidence does not support a finding of negligence in failing to hospitalize Tarver.  Moreover, in his testimony regarding ground no. 6, Dr. Ratner based his complaint about the VA's failure to act on November 18, 2004 specifically on the failure to attempt to put Tarver in the CSTP.  Finally, when he was asked whether Tarver was a candidate for inpatient treatment on that date, Dr. Ratner responded that he might have been, but that he could not say for sure because he did not have a full picture of Tarver's clinical condition and did not know whether he met VA criteria for admission.  And he opined that it would have been preferable to get the CSTP involved.

- 13 -

hospitalization the prior year, well above the program minimum. Tarver, by contrast, was hospitalized for two weeks in 2004 and had no hospitalizations during the prior year.

Dr. Ratner recognized that, outside of an inpatient setting, the CSTP was the only program available to Drs. Navarro and Khan involving intensive monitoring.  In response to a question asking Dr. Ratner to assume that there were no resources in September 2004 for the CSTP to monitor Tarver, he opined that "the doctors should have documented they attempted to do that [get Tarver into the CSTP] and pushed for it[.]"  Ratner Dep. 49.  He also asserted that the CSTP criteria were based on factors such as fiscal and staffing issues, not clinical issues, and that it was the physicians' responsibility, based on a clinical assessment, to make a plea to the program to get involved.  Plaintiffs have failed to prove that Drs. Navarro and Khan were negligent in failing to push or plead for Tarver's inclusion in a VA program for which he did not qualify (and, based on 2004 data, for which he fell significantly below the qualifications of the average participant).  Nor did plaintiffs prove that Drs. Navarro and Khan were negligent in failing to document their attempts to do so.  At bottom, the evidence shows that the VA has a program (the CSTP) whose purpose is to reduce psychiatric hospitalizations by keeping patients in the community. To promote this purpose, it imposes admission criteria that require high hospital utilization.  Tarver did not fall within the group

for whom the program is intended.  And Drs. Navarro and Khan lacked the authority to admit Tarver to the program despite his ineligibility.

Additionally, over a period of several years, including when Tarver was discharged in September 2004, VA personnel attempted several times to persuade him to enter a group home——which was an available option——even contacting his mother to solicit her support.  But Tarver consistently refused to go voluntarily into a group home setting, even though the evidence shows that a group home would have benefited him more than would the CSTP, since there would be someone to assist him in taking his medications, thereby reducing his chances of relapsing.  Both programs——the group home and the CSTP——were voluntary.  It was not negligent for VA physicians to attempt to persuade Tarver to live a group home, for which he was eligible, rather than to engage in a futile attempt to secure his admission into the CSTP, for which he was ineligible.

D

The court finds that plaintiffs proved by a preponderance of the evidence that Drs. Navarro and Khan were negligent in failing to inform and educate Tarver's family concerning monitoring and supervision of medications, such as dosages, side effects, and warning signs of toxicity.

As Dr. Ratner explained, under the standard of care, a physician informs the patient about the kind of treatment he is

receiving, why he is receiving it, what he would be like with no treatment or an alternative treatment, and the risk/benefit ratio of the treatment.   When starting a patient on sertraline, the physician would include a specific discussion of that prescription medication, but would also discuss all prescriptions, even those that had been prescribed before.   If the physician thinks the patient does not understand the full risks and benefits of the medications he is taking, the physician usually contacts someone, such as a family member or close friend, who knows or lives with the patient.   This is especially done when the patient will not be monitored.   The physician discusses the risks and benefits of the medications and the signs of side effects to look for.   Sometimes these persons are asked to call if the patient begins to look a certain way because this could be a sign of toxicity. Because sertraline was a new prescription, the family would especially need to know about the medications Tarver was taking.

The United States appeared to attempt (either at trial or during the deposition) to counter Dr. Ratner's opinion on three bases: Tarver himself was given adequate warnings, there was no need to warn Tarver or his family about possible interactions involving the drugs he was taking because none of these drugs was known to interact adversely with another, and the family was not sufficiently involved to be contacted.   These contentions are insufficient to avoid a finding of negligence.

- 16 -

First, a fundamental premise of Dr. Ratner's opinion is that Tarver was not capable of understanding the risks of the medications he was taking. This is why it was necessary to inform and educate the family. Plaintiffs proved that Tarver was unable to comprehend the full risks, both when he was discharged from the hospital on September 28, 2004 and when he left Dr. Navarro's office on November 18, 2004.

Second, while the evidence supports the finding of an absence of known drug interactions, this does not address Dr. Ratner's opinion that the standard of care required that patients (and families, when necessary) be informed and educated about the warning signs of drug toxicity. The evidence shows that drug toxicity can occur without drug interactions.

Third, the evidence shows that the VA was aware of Tarver's family and attempted to contact family members for other purposes, such as to secure his mother's assistance in persuading him to go to a group home. And Tarver's brother in fact attended the November 18, 2004 appointment and provided Dr. Navarro relevant information about Tarver's history. The proof shows that Tarver's family could have been contacted and informed and educated.

The court therefore finds that plaintiffs proved that Drs. Navarro and Kahn were negligent in failing to inform and educate Tarver's family concerning monitoring and supervision of his medications.

IV

The court now turns to the element of proximate cause.
Although the court has found that Drs. Navarro and Khan were
negligent in one respect, plaintiffs must still prove that this
negligence was a proximate cause of the drug overdose that led to
Tarver's death.  To prove causation, plaintiffs rely on the expert
testimony of Gary H. Wimbish, Ph.D. ("Dr. Wimbish"), a forensic
toxicologist, and Dr. Ratner.

A

Dr. Wimbish's primary relevant opinion is that Tarver died
from a chronic overdose of demethylsertraline, a metabolite of
sertraline, that had built up over time.  His opinion is critical
to plaintiffs' case because it supports the premise that toxicity
from demethylsertraline, caused by the combination of sertraline
and valproic acid, was observable over a sufficient time period
that steps could have been taken to prevent Tarver's death from a
drug overdose.  In other words, it is crucial to plaintiffs' proof
of the essential element of proximate cause.

Dr. Wimbish opined that the high concentration of
demethylsertraline found in Tarver's blood was caused by the
interaction between sertraline and valproic acid.  He reasoned that
valproic acid inhibited a step in the metabolism process, thereby
increasing significantly the demethylsertraline in Tarver's blood

stream, resulting in a fatal prescription drug overdose.[14]

Dr. Wimbish's theory is contradicted by the testimony of Lynn A. Salzberger, M.D. ("Dr. Salzberger"), the medical examiner who performed Tarver's autopsy.[15]  According to Dr. Salzberger, Tarver died of an acute overdose rather than a chronic overdose, taken in a large amount at approximately the same time.  She opined that it may not have been an acute overdose taken just hours before he died, but it may have been the day or so before.  The sertraline and olanzapine likely caused the drug overdose, and the valproic acid was probably insignificant in the cause of death.  The demethylsertraline level was extremely high, in the toxic to lethal range, the sertraline and the olanzapine levels were both elevated,

---

[14]Dr. Wimbish also referred in his testimony to the effect of valproic acid and the presence of olanzapine.  The United States objected to the testimony on the ground that it exceeded the scope of Dr. Wimbish's expert report.  The court now overrules the objection as moot.  Even assuming *arguendo* that the opinion exceeds the scope of the report, the court rejects Dr. Wimbish's ultimate pertinent opinions for the reasons explained in this memorandum opinion.

[15]It is well settled that the court, as the trier of fact, can choose to believe one expert witness over another.  *See, e.g., Valdez v. Ward*, 219 F.3d 1222, 1238 (10th Cir. 2000) (holding that determination that expert's "testimony at trial was more credible was an issue solely within the province of the jury.") (citing *United States v. Castaneda-Reyes*, 703 F.2d 522, 524 (11th Cir. 1983) (holding that whether testimony of one expert witness was more believable than testimony of another expert witness was issue for trier of fact)); *see also Blancha v. Raymark Indus.*, 972 F.2d 507, 515 (3d Cir. 1992) ("[T]he jury was free to believe either plaintiffs' experts, who testified that all asbestos products cause mesothelioma, or Keene's expert, who testified that at least one fiber, chrysotile, does not.").

and the valproic acid was not even high enough to be therapeutic. It was insignificant in the cause of death.  Because the court accepts Dr. Salzberger's opinions, Dr. Wimbish's theory that sertraline and valproic acid combined to cause a chronic overdose of demethylsertraline is not entitled to weight and is rejected. The court finds that the valproic acid was insignificant in causing Tarver's death, and it finds that Tarver died within approximately no more than one day or so of taking a large amount of drugs at approximately the same time.

Dr. Wimbish's opinions are also undermined, if not refuted outright, by the testimony of plaintiffs' other expert, Dr. Ratner. Dr. Ratner has prescribed sertraline and valproic acid together for patients with schizoaffective disorder, bipolar type.  He has also prescribed in combination sertraline, valproic acid, and olanzapine for patients with schizoaffective disorder, bipolar type.  Dr. Ratner testified that he had no problems with the prescription on September 28, 2004 of 1500 milligrams of valproic acid, 100 grams of sertraline, and 40 milligrams of olanzapine.  He opined that this prescription—given at discharge on September 28, 2004—was within the standard of care.  And it was within the standard of care when it was renewed on November 18, 2004.  He testified that he had no problems whatsoever with either prescription.  Dr. Ratner read Dr. Wimbish's expert report and disagreed with his conclusion that it was negligence to prescribe sertraline and valproic acid

together in the amounts prescribed.  Dr. Ratner also opined that several of Dr. Wimbish's criticisms did not reflect the standard of care in the clinical practice of psychiatry.

In sum, the court rejects Dr. Wimbish's pertinent opinions.

B

Nor is the court persuaded by Dr. Ratner's testimony concerning causation.

1

The court first addresses Dr. Ratner's testimony attempting to causally link Tarver's death with the failure to include him in the CSTP.  Although the court has found that plaintiffs failed to prove that Drs. Navarro and Khan were negligent in this respect, an explanation of their failure to prove causation is itself instructive.  And it assists in understanding the court's reasoning below for holding that plaintiffs' failure to prove that the doctors' negligence in failing to inform and educate the family was a proximate cause of Tarver's death.[16]

When asked how the failure of the VA to place Tarver in the CSTP or inpatient care led to his death, Dr. Ratner testified at a very general level that a lack of monitoring placed Tarver in a situation where he would be put at risk.  This deficiency in his

_____

[16]It also serves as a basis for holding that plaintiffs failed to prove the element of proximate cause, assuming *arguendo* that they proved the VA was negligent on a basis apart from the conduct of Drs. Navarro and Khan.  *See infra* § V.

testimony is perhaps due to the fact that Dr. Ratner testified at trial by means of a discovery deposition taken by the United States. But whatever the reason, the evidence of causation simply was not sufficiently developed. Dr. Ratner opined that it was a combination of not taking action at the time of discharge or when he was seen later, i.e., on November 18, 2004, that contributed to his death. According to Dr. Ratner, and based on the conclusion of the medical examiner, Tarver died from a prescription drug overdose, probably related more to sertraline. Had Tarver been in the CSTP, the team could have monitored whether he was taking his prescription medications and observed his clinical state. Dr. Ratner's understanding of the CSTP was that VA personnel would be able to monitor Tarver through home visits and telephone contacts made from one to three times per week. Dr. Navarro explained that because case managers in the CSTP do not visit patients daily, there is room for a patient not to adhere to the correct regimen.

But as explained above, Dr. Salzberger opined (and the court has found) that Tarver died of an acute overdose, not a chronic overdose, taken in a large amount at approximately the same time. It may not have been an acute overdose taken just hours before he died; it may have been the day or so before. The CSTP involved staff home visits or telephone contacts at a frequency ranging from one to three times per week. As Dr. Navarro testified, due to the timing of case manager visits, there was definitely room for a

patient not to adhere to the correct regimen.  Plaintiffs have therefore failed to prove that, had Tarver been placed in the CSTP, his participation could or would have prevented him from taking an acute overdose, or from doing so between staff visits.  Given the intervals between visits and the short time that elapsed before when he overdosed and when he died, the CSTP regimen would not necessarily have prevented his death, even had he been a program participant.

2

Plaintiffs also failed to prove by a preponderance of the evidence that the negligence of Drs. Navarro and Khan in not informing and educating the family was a proximate cause of Tarver's death.

It is a reasonable inference from the evidence that Tarver's family had been aware for several years that he was being treated with prescription drugs, yet the evidence is undisputed that he was chronically noncompliant in taking his medications.  This means that, despite the knowledge and any efforts of his family, Tarver sometimes took more medication than he should have, sometimes less, and sometimes none at all.  Plaintiffs failed to prove that, had the family been informed and educated between September 14, 2004 and November 18, 2004[17] of the addition of sertraline to Tarver's

---

[17]Dr. Ratner specified that these were the dates on which he bases his opinion that the standard of care was breached.  *See supra* § III(A).

prescription drug regime, this could or would have materially
impacted how Tarver took his prescription medications.  In other
words, it is a fair inference from the evidence that, if the family
had had little impact on him before, there is little reason to
believe that would have changed after the doctors informed and
educated them in 2004 about the medications he was taking,
including the addition of sertraline.  And as specifically relevant
to the court's negligence finding, plaintiffs have also failed to
prove that a family member would have been able to notify the VA in
time to prevent or treat an overdose taken within approximately no
more than one day or so before Tarver's death.  Unfortunately, it
can reasonably be inferred from the evidence that, even had the
family been informed and educated, Tarver would just as likely have
died from a fatal overdose of prescription drugs due to the short
time frame necessary for it to have a deadly effect.

Moreover, perhaps because Dr. Ratner testified by means of
deposition questions posed by defense counsel, he was not
specifically asked to opine about how the failure to notify the
family proximately caused Tarver's death.  When answering a
question about the causal connection between a lack of CSTP
monitoring and Tarver's death, Dr. Ratner did say that "either
hopefully with the family informed and/or the system in place, they
would have seen him becoming slow, becoming confused and would have
known what to do."  Ratner Dep. 68.  But this evidence is

insufficient to persuade the court of a causal connection between the negligence of Drs. Navarro and Khan in not informing and educating the family, and the drug overdose that caused Tarver's death.   When Dr. Ratner discussed the side effects of the medications Tarver was taking, he specifically addressed only sertraline, and he identified the following side effects as the ones he would have advised the family about: "headache, dizziness, nausea . . . excessive tiredness . . . excessive jitteriness . . . problems with coordination, balance." *Id.* at 59.  This means that, at least in terms of what Dr. Ratner specifically identified in his deposition, even had the family been properly advised, they would *not* necessarily have been informed to watch for the signs and symptoms that Dr. Ratner identified when addressing causation.  So even if Tarver did become slow or confused, but he did not suffer from headache, dizziness, nausea, excessive tiredness, excessive jitteriness, or problems with coordination or balance, the family might not have been alerted to a need to contact the VA.

In sum, plaintiffs failed to prove that the negligence of Drs. Khan and Navarro was a proximate cause of the drug overdose that led to Tarver's death.

V

Although the focus of plaintiffs' case is on the alleged negligence of Drs. Navarro and Khan, it is possible to read the pretrial order to assert a separate negligence claim against the

- 25 -

United States based on the conduct of the VA as a healthcare provider.[18]

"A hospital may be directly liable if the hospital breaches a duty which it owes directly to the patient." *McCombs v. Children's Med. Ctr. of Dallas*, 1 S.W.3d 256, 259 (Tex. App. 1999 (pet. denied)).

> To prevail in a medical negligence cause of action, the plaintiff must prove (1) a duty by the . . . hospital to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection between the breach of care and the injury.

*Id.* (citing cases). "A hospital may be vicariously liable for the negligence of its employees or agents under theories of respondeat superior and ostensible agency if the employee or agent is negligent and proximately causes the injury." *Id.* (citing *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947-48 (Tex. 1998)).

Under Texas law, "negligence," when used with respect to the conduct of the VA, means failure to use ordinary care, that is,

---

[18]It is also possible to conclude that no such claim is asserted. Plaintiffs originally filed this suit in Texas state court against only Drs. Navarro and Khan individually. After Drs. Navarro and Khan removed the case, the United States moved under the FTCA to be substituted as the defendant. At trial, in opening statement and in closing argument, plaintiffs focused on the alleged negligence of Drs. Navarro and Khan. They did not elaborate on separate alleged negligence of the VA as a healthcare provider. In the interest of completeness, however, the court will assume that plaintiffs have asserted a claim based on alleged negligence of the VA as a healthcare provider that is distinct from the claims made against the United States based on the alleged negligence of Drs. Navarro and Khan.

failing to do that which a hospital of ordinary prudence would have done under the same or similar circumstances or doing that which a hospital of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care," when used with respect to the conduct of the VA, means that degree of care that a hospital of ordinary prudence would use under the same or similar circumstances."

"Proximate cause," when used with respect to the conduct of the VA, means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred.  In order to be a proximate cause, the act or omission complained of must be such that a hospital using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom.  There may be more than one proximate cause of an event.

To the extent that plaintiffs allege that the VA as a health care provider was negligent on a basis other than one asserted against Dr. Navarro or Dr. Khan, the court finds that they failed to prove that the VA was negligent or that any such negligence proximately caused Tarver's death.  Specifically, even if plaintiffs proved that it was negligent for the VA to adopt a program (the CSTP) with requirements that precluded Tarver's participation, they failed, for the reasons explained above, *see* *supra* § IV(B)(1), to prove that this negligence was a proximate

cause of Tarver's death.

*      *      *

Accordingly, for the reasons explained, the court finds in favor of the United States and dismisses this case with prejudice by judgment filed today.

June 4, 2009.


_____
SIDNEY A. FITZWATER
CHIEF JUDGE